UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x

JANE ROE,

Plaintiff,

-against-

SUPER HOST HOTELS, INC. d/b/a RAMADA PLAZA BY WYNDHAM and WYNDHAM HOTELS & RESORTS, INC.,

Defendants.

---------------------------------------------------------------------x

**COMPLAINT**

(Jury Trial Demanded)

1:26 CV 1578 (MAD/ML)

Plaintiff Jane Roe, by her attorneys, The Law Firm of Andrew M. Stengel, P.C., 11 Broadway, Suite 715, New York, New York, 10004, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## NATURE OF ACTION

1. This action, under federal and New York sex trafficking laws, arises from the trafficking of Plaintiff for nearly three years at the Ramada Plaza by Wyndham in Albany, New York.

2. This lawsuit seeks to hold Defendants liable for participating in and knowingly profiting from sex trafficking ventures concerning Plaintiff.

3. According to the U.S. Department of Homeland Security, "Trafficking is a huge and thriving business, yielding an estimated $32 billion in illicit profits each year."[1]

4. Sex trafficking enterprises brazenly operate in and out of hotels throughout this country. Sex traffickers parade their misconduct openly on hotel properties throughout the United

---

[1] United States Department of Homeland Security, *Human Trafficking – modern day slavery*, https://www.ice.gov/news/releases/using-financial-attack-strategy-combat-human-trafficking.

States while the hotels and hospitality industry remain willfully blind to the criminal misconduct to continue earning a profit at the expense of human life, rights and dignity.

5. Rather than taking timely and effective measures to thwart the epidemic of sex trafficking, Defendants participated in and enjoyed the profits from rooms rented for the explicit and apparent purpose of Plaintiff's sex trafficking.

6. This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified as Jane Roe, under the federal Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA"), 18 U.S.C. § 1595, and New York State's Trafficking Victims Protection and Justice Act (hereinafter "TVPJA"), codified at Social Services Law § 483-bb(c).

**PARTIES, JURISDICTION AND VENUE**

7. Plaintiff Jane Roe, a female, is a resident of the State of New York.

8. Plaintiff seeks to bring this action under a pseudonym because of the sensitive nature of the allegations of sex trafficking and sexual assault in this Complaint, which are matters of the utmost intimacy. Plaintiff fears embarrassment and further psychological damage if her identity as a victim of sex trafficking and sexual assaults were to become publicly known.

9. At all relevant times, Defendant Super Host Hotels, Inc. d/b/a Ramada Plaza by Wyndham was and is a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York with a business address of 1101 Harbor Road, Hewlett, NY 11557.

10. At all relevant times, Defendant Super Host Hotels, Inc. d/b/a Ramada Plaza by Wyndham was and is a business entity doing business in the counties of Albany and Nassau, State of New York.

11. At all relevant times, Defendant Wyndham Hotels & Resorts, Inc. was and is a foreign corporation duly authorized to do business in the State of New York and/or doing business in the State of New York.

12. Defendant Wyndham Hotels & Resorts, Inc. was formed in or about May 2018, when Wyndham Worldwide Corporation completed a corporate separation of its hotel franchising operations into a separately traded public company.

13. Pursuant to that separation, upon information and belief, Wyndham Hotels & Resorts, Inc. assumed all obligations and liabilities associated with the hotel franchising operations previously conducted by Wyndham Worldwide Corporation, including those arising from or relating to the Ramada brand and the franchise agreement governing the Ramada Plaza by Wyndham where Plaintiff was trafficked.

14. Defendants Super Host Hotels, Inc. d/b/a Ramada Plaza by Wyndham and Wyndham Hotels & Resorts, Inc. are hereinafter collectively known as the "Wyndham Defendants."

15. Within the Wyndham Defendants, Defendant Wyndham Hotels & Resorts, Inc. is hereinafter referred to as the "Franchisor Defendant," and Defendant Super Host Hotels, Inc. is hereinafter known as the "Franchisee Defendant."

16. At all relevant times, the Wyndham Defendants owned, managed, controlled and/or operated the Ramada Plaza by Wyndham (hereinafter "Ramada Plaza") located at 3 Watervliet Avenue Extension, Albany, NY 12206.

17. At all relevant times, the Wyndham Defendants, pursuant to a franchising agreement, owned, managed, controlled and/or operated the Ramada Plaza property where Plaintiff was sex trafficked.

18. Harold Nelson (hereinafter "Nelson") is the individual who sex trafficked Plaintiff at the hotels named herein.

19. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, as the Complaint asserts causes of action created by federal law, namely claims under the TVPRA.

20. The Court may also exercise supplemental jurisdiction over any related state law claims under 28 U.S.C. § 1367(a).

21. Venue is proper in the Northern District of New York under 28 U.S.C. §§ 1441(a) and 112(b).

## FACTUAL ALLEGATIONS

### The Hotel Industry's Role in Sex Trafficking

22. The hospitality industry plays a crucial role in sex trafficking. The trope of the "no-tell hotel" was not recently coined. Hotels have long profited from their reputations as havens of privacy and discretion for the offending because they offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking.

23. The Wyndham Defendants named herein are aware of the important role that hotels play in the proliferation of sex trafficking and of the revenue they derive from sex trafficking, both directly and indirectly, from sex trafficking that occurs at their properties. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] For years, sex traffickers have "been able to reap these profits with little risk when attempting to operate within

[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ (*citing* Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere."

hotels."[3] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4]

24. Recognizing the unique vantage point that hotel owners and staff often have to identify potential sex trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking. In order to meet that responsibility, most major hotel chains, like the Wyndham Defendants named herein, have adopted robust anti-sex trafficking policies to train their employees to identify and properly respond to the "red flags" of sex trafficking.

25. Defendants named herein had the opportunity and responsibility to adopt, implement and enforce similar policies at their hotels.

26. Unfortunately for Ms. Roe, such policies were not in place or were not enforced at their hotels.

27. According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur. Traffickers and buyers alike frequently use hotel rooms to exploit victims.

28. Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted and forced to service buyers who come to the hotel solely to purchase sex from sex trafficking victims.

---

[3] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; see also Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-traffickingvictimslifeus57714091e4b0f168323a1ed7.

[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

29. Due to the overall complacency of the hospitality industry in addressing sex trafficking, hotels are *the* venue of choice for sex trafficking. Sex traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond and/or establish safe and secure reporting mechanisms for those at the point of sale.

30. To address the crisis of sex trafficking at hotels, multiple agencies and organizations that actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, ECPAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[5]

31. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which the Wyndham Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[6]

a. Individuals who show signs of fear, anxiety, tension, submission and/or nervousness;

b. Individuals who show signs of physical abuse, restraint and/or confinement;

c. Individuals who exhibit evidence of verbal threats, emotional abuse and/or being treated in a demeaning way;

---

[5] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors; Love 146, Red Flags for Hotel & Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, https://www2.texasattorneygeneral.gov/files/humantrafficking/humantraffickingredflagshandout.pdf.

[6] *See id.*

d. Individuals who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries and/or unusual behavior;

e. Individuals who lack freedom of movement or are constantly monitored;

f. Possession or use of large amounts of cash or pre-paid cards;

g. Individuals who avoid eye contact and interaction with others;

h. Individuals who have no control over or possession of money or identification;

i. Individuals who dress inappropriately for their age or have lower-quality clothing compared to others in their party;

j. Individuals who have few or no personal items—such as no luggage or other bags;

k. Individuals who appear to be with a significantly older "boyfriend" or in the company of older males;

l. A group of women who appear to be traveling with a male;

m. A group of men or women who have identical tattoos in similar locations, which may indicate "branding";

n. Drug abuse or frequent use of heroin;

o. Frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), methamphetamines, Cocaine and Marijuana;

p. Possession of bulk sexual paraphernalia such as condoms or lubricant; and

q. Possession or use of multiple cell phones.

32. Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation and trafficking where it is most likely to occur.

33. Aside from their unique position in this epidemic, hotels also have one of the highest obligations to protect their guests from known dangers, including sex trafficking and sexual exploitation and should be held accountable when they fail to do so. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[7]

34. Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry to help hotel staff in every position to identify the signs.

35. From check-in to check-out, there are a number of indicators that sex traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

36. The hospitality industry has been cognizant of its role and responsibilities in the sex trafficking industry for decades.

37. Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as

---

[7] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), p. 1, https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

1997 with the United Nations Blue Heart Campaign[8] and domestically in 2010 with the Department of Homeland Security's Blue Campaign. These efforts sought to educate both the public and private sectors on identifying and combating human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.

38. Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly failed to heed the call or repeatedly failed to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and increase the bottom line.

39. Hotel brands or flags often lend their name and likeness to third-party owners, while the building and operations are run by a franchisee or third-party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract or membership agreement and still profits from putting heads in beds.

40. However, the average consumer is not aware of this relationship. The parent brand gives the franchisee property its entire identity. It provides signage on and in front of the building that assures customers that if they check into that hotel, then they can expect the standards consistent with the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens in the bedside tables to the staff uniforms at the front desk.

41. In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand-wide central reservation system, an 800 number,

---

[8] *See Human trafficking: the facts*, United Nations Office on Drugs and Crime, https://www.unodc.org/documents/blueheart/Factsheetenglish.pdf.

revenue management tools, world-class loyalty programs and a website. This is so that booking and room reservations, the source of profits for the entire industry, are controlled by the corporate parent brand.

42. The franchise hotel typically pays approximately 10% of its total revenue back to the parent hotel brand and is required by the brand to develop and maintain the property in accordance with the parent hotel brand's standards, as they are laid out in the franchise agreement.

43. At the time of the incidents alleged herein, the Wyndham Defendants named herein knew or should have known that illegal activities, including sex trafficking ventures, were taking place on the hotel properties where Plaintiff was sex trafficked.

44. While parent hotel brands may expel delinquent hotels from their system, they seldom do because doing so comes at the expense of terminating royalty payments. Even an inadequate or dangerous hotel under the parent hotel brand's flag generates more revenue than no hotel.

45. Per the franchise agreement, the parent brand may enforce these standards through periodic audits, inspections and termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the parent hotel brand to enforce its brand standards is also its responsibility.

**The Franchisee Hotel Defendant Was Required to Report Sex Trafficking to the Hotel Franchisor Defendant**

46. The relationships between the Wyndham Defendants and the Ramada-branded franchise hotels were governed by franchise agreements.

47. At all relevant times, the Wyndham Defendants had robust reporting requirements in place for their franchisees, Ramada-branded franchise hotels, including the Ramada Plaza.

48. The Wyndham Defendants require their franchisees, Ramada-branded franchise hotels, including the Ramada Plaza, to report all suspected instances of crime at their properties.

49. Based on information observed by the staff, reports should have been made to the Wyndham Defendants about the sex trafficking of Ms. Roe.

50. The Wyndham Defendants exercised pervasive and systematic control over their Ramada-branded franchise hotels, including the Ramada Plaza.

51. The Wyndham Defendants exercised an ongoing and systemic right of control over the Ramada-branded franchise hotels, including the Ramada Plaza.

52. At all relevant times, the Wyndham Defendants were subject to and required to comply with franchise agreement standards, policies and rules adopted by the Wyndham Defendants. These standards and policies are detailed and control the specific manner and means by which their franchisees, Ramada-branded franchise hotels, including the Ramada Plaza, must operate the hotels.

53. The Wyndham Defendants require theirits franchisees, Ramada-branded franchise hotels, including the Ramada Plaza, to report all suspected instances of sex trafficking at their properties.

54. The Wyndham Defendants required their franchisees, Ramada-branded franchise hotels, including the Ramada Plaza, to allow the Wyndham Defendants to regularly inspect their hotels.

55. The Wyndham Defendants regularly inspected their Ramada-branded franchise hotels, including the Ramada Plaza.

56. The Wyndham Defendants required their Ramada-branded franchise hotels, including the Ramada Plaza, to adhere to strict requirements, including but not limited to:

a. Standardized training methods for employees;

b. Building and maintaining the hotels in a manner specified by the Wyndham Defendants;

c. Standardized or strict rules of operation for the hotels;

d. Regular inspection of the hotels and their operation by the Wyndham Defendants;

e. Prices fixed by the Wyndham Defendants;

f. The Wyndham Defendants provided online booking platforms;

g. The Wyndham Defendants established reporting requirements for the hotels; and

h. Other actions that deprived their branded franchise hotels of independence in their business operations.

57. The Wyndham Defendants specifically retained control over the day-to-day operation of their Ramada-branded franchise hotels, including the Ramada Plaza, concerning aspects of operation of the hotels that caused Plaintiff's harm, including but not limited to reservation policies and procedures, staff training, security policies and training, education policies and procedures concerning sex trafficking.

58. The Wyndham Defendants regularly advised their Ramada-branded franchise hotels, including the Ramada Plaza, on operational changes necessary for them to remain in compliance with the strict regulations of the Wyndham Defendants.

59. The Wyndham Defendants had the ability to impose fees or fines on their Ramada-branded franchise hotels, including the Ramada Plaza.

60. Furthermore, at all material times, the Wyndham Defendants retained an absolute right to cancel their franchise agreements with the Ramada-branded franchise hotels, including the Ramada Plaza, if the rules of the Wyndham Defendants were violated or if their Ramada-branded franchise hotels otherwise failed to comply with their contractual obligations.

61. At all relevant times, the Ramada-branded franchise hotels, including the Ramada Plaza, acted as the agent of the Wyndham Defendants.

62. The Wyndham Defendants and their Ramada-branded franchise hotels, including the Ramada Plaza, shared control of the terms and conditions of the employment of staff and, therefore, the Wyndham Defendants and their Ramada-branded franchise hotels were joint employers.

63. Upon information and belief, the Wyndham Defendants exercised control over the terms and conditions of employment of staff at the hotels at issue.

64. Therefore, as a result of the strict reporting requirements, at all material times, Defendants knew or should have known of their facilitation of sex trafficking at the Ramada Plaza, including the facilitation of the sex trafficking of Plaintiff.

**The Willful Blindness to Sex Trafficking at Defendants' Hotel**

65. Defendants have been on notice of repeated incidences of sex trafficking occurring at their Ramada-branded franchise hotels, including the Ramada Plaza, yet these owners, franchisors, franchisees, brand managers and/or supervisors failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

66. Upon information and belief, despite knowledge of the problem of sex trafficking in their hotels, Defendants did not require that employees participate in training to recognize, report and prevent sex trafficking.

67. At all relevant times, the Wyndham Defendants named herein owned, operated, managed, supervised, controlled and/or were responsible for the operations of Ramada Plaza.

68. Defendants acted jointly to rent rooms at the Ramada Plaza, with the Wyndham Defendants retaining control over reservation systems and policies, training and protocols as further described in this Complaint.

69. Defendants were jointly responsible for customer safety and, specifically, the prevention of sex trafficking at the hotel.

70. The Wyndham Defendants retained control over, and thus had a duty with respect to, customer safety at the hotels generally and specifically regarding detection of and response to sex trafficking at the hotels.

71. Armed with knowledge of the prevalence of trafficking in the hotel industry, at hotels across the country and the signs present at the Ramada Plaza, Defendants had an obligation to enact, implement, follow and enforce policies to identify sex trafficking and not to participate in or benefit from the facilitation thereof.

72. Defendants failed to do so and thus facilitated sex trafficking that operated out of the hotels.

73. The most effective weapon against sexual exploitation and sex trafficking is education and training. As ECPAT concluded: "The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels ranging from budget properties to

luxury resorts. From check-in to check-out there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property."[9]

74. This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained." In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

75. If the Defendants had adequately trained and implemented guidelines, "red flags," training, policies and procedures and other recommendations adopted in the industry, Defendants would have or should have known of Plaintiff's trafficking and would have been in a position to prevent the trafficking of Plaintiff.

76. The "red flags" and signs of a sex trafficking venture described above were observed at the Ramada-branded franchise hotels, including the Ramada Plaza.

77. Upon information and belief, employees and agents of Ramada-branded franchise hotels, including those of the Ramada Plaza, should have reported the signs of sex trafficking to the Wyndham Defendants.

78. If the Wyndham Defendants named herein educated and/or trained their actual or apparent agents, servants, franchisees, employees and/or staff regarding sex trafficking and their warning signs, then their actual or apparent agents, servants, franchisees, employees and/or staff

---

[9] ECPAT USA, *Training for Hotel Associates,* https://www.ecpatusa.org/hotel-training.
*See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry, J. Tourism Hospit.* (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

would have been more aware of sex trafficking taking place at their hotels and could have, at best, prevented it from happening or, at worst, been more willing to report it when it happened.

79. Defendants' active decisions not to prevent and stop sex trafficking and sexual exploitation at their hotels make them accountable to victims of sex trafficking, including Plaintiff.

80. Thus, Defendants engaged in an act or acts and omissions that supported, facilitated, harbored and otherwise furthered the sex trafficker's sale and victimization of Plaintiff for commercial sexual exploitation.

81. More specifically, Defendants rented rooms to Plaintiff's sex trafficker, permitted their illicit enterprise to operate on an ongoing and repetitious basis, and took no action to abide by the self-imposed anti-trafficking measures of the Wyndham Defendants. This and related behavior by Defendants provide an ample basis to conclude that they participated in the venture that trafficked Plaintiff.

82. The motivation behind Defendants' ongoing willful blindness and ongoing failure to act is plain and simple: limitless corporate greed.

83. Defendants ignored all of the signs of and/or solutions to sex trafficking out of an unfettered fealty to their profit margins and a corresponding complete disregard for the value of human life.

**The Hotel Defendants Knowingly Benefitted from Sex Trafficking**

84. Plaintiff alleges that Defendants knowingly received benefits from participating in the venture that facilitated the trafficking of Ms. Roe.

85. As a result of the strict reporting requirements at all relevant times, the Wyndham Defendants knew they were facilitating and benefitting from sex trafficking at the hotels, including the sex trafficking of Ms. Roe and other victims of sex trafficking.

86. The Wyndham Defendants generate substantial income from the operations of hotels.

87. In exchange for providing the services described above and more specifically delineated in the controlling franchise agreement, the Wyndham Defendants received a share of the profits from room rentals collected by Ramada-branded franchise hotels, including the Ramada Plaza.

88. The primary source of income for the Wyndham Defendants is the franchising royalty fee, but the Wyndham Defendants also profit from reservation fees, marketing fees, loyalty program fees and other miscellaneous ancillary fees, as described in the franchise documents. The fees generated by the Wyndham Defendants are primarily based on gross room rentals; therefore, the profits increase with each room rental of the Wyndham Defendants.

89. The branded franchise hotels, as franchisees, profited from every stay by every patron at their hotels, both from room rentals and other hotel services.

90. Upon information and belief, the Wyndham Defendants knowingly benefitted from their participation in the sex trafficking venture carried on at the hotels in that they received a portion of the proceeds collected by their franchisee.

91. Therefore, at all material times, the Wyndham Defendants and the Ramada-branded franchise hotels, including the Ramada Plaza, received monetary payment for the rental of rooms at the hotels, including the rooms where Plaintiff was being trafficked.

92. Despite knowledge of the sex trafficking venture occurring, both the Wyndham Defendants and their Ramada-branded franchise hotels, including the Ramada Plaza, continued to financially benefit from Plaintiff's stays, all while doing nothing to prevent or stop criminal activity-sex trafficking, including the trafficking of Plaintiff, from occurring on their property.

93. As a result of the monies paid by Plaintiff's sex traffickers to secure the rooms for her trafficking, and through ways described more fully above, the Wyndham Defendants knowingly benefitted from participating in a venture in the form of a continuous business relationship with sex traffickers at the Ramada Plaza ("the **Room-Rental Venture**") who trafficked Plaintiff.

94. The Wyndham Defendants formed these continuous business relationships with the traffickers at the Ramada Plaza by continuing to rent rooms to traffickers, including Plaintiff's trafficker, after the Wyndham Defendants knew or should have known that the rooms were being used for unlawful sex trafficking.

95. This implicit understanding developed because sex traffickers, including Plaintiff's trafficker, frequently used the Ramada Plaza for sex trafficking knowing that staff members would look the other way or actively participate in the trafficking operation. This occurred because of the acts and omissions of both the Franchisor Defendant and Franchisee Defendant that created a favorable environment for sex trafficking to flourish.

96. Both the Franchisor Defendant and Franchisee Defendant participated in the Room-Rental Venture by acting jointly to rent rooms to sex traffickers after they knew or should have known that hotel rooms were being used for unlawful sex trafficking, as further described throughout this pleading.

97. The Franchisee Defendant provided the front-line reservations, and the Franchisor Defendant directly participated in renting rooms to guests, retained control over reservation systems and developed and enforced applicable policies and guidelines as further described in this pleading.

98. The Wyndham Defendants not only provided these traffickers with a physical space but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption.

99. This was done pursuant to an implicit agreement with the Wyndham Defendants, which is evidenced as set forth below, among other things:

a. The sex trafficker was familiar to the staff at the Ramada Plaza;

b. The sex trafficker freely made requests that would facilitate his trafficking activities without concern for detection or interference by staff;

c. The Wyndham Defendants allowed the sex trafficker to take steps that would minimize his traceability to law enforcement, such as accepting cash payments and pre-paid debit cards and not requiring identification from appropriate parties; and

d. The Wyndham Defendants provided additional services to the sex traffickers, such as providing excessive towels and linens, reducing housekeeping services in the rooms where sex trafficking occurred and changing the times at which such services were performed.

100. The Wyndham Defendants further overlooked the fact that hotel managers at the Ramada Plaza actively participated in and facilitated Plaintiff's trafficking, as further described below.

101. Plaintiff's trafficking at the Ramada Plaza was a result of each of the Wyndham Defendants' participation in the Room-Rental Venture with criminal sex traffickers, including Harold Nelson.

102. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), then they would not have received a benefit from Plaintiff's trafficking.

103. The Franchisor Defendant also knowingly received a financial benefit from participating in a commercial venture with the Franchisee Defendant operating the Ramada Plaza ("**the Franchise Operations Venture**").

104. The Franchisor Defendant and Franchisee Defendant had longstanding business relationships at the Ramada Plaza pursuant to which they jointly participated in the operation of the hotel with a shared goal of maximizing revenue, including gross room revenue.

105. The Wyndham Defendants were jointly responsible for customer safety and, specifically, prevention of human trafficking at the Ramada Plaza.

106. The Franchisor Defendant retained control over, and thus had a duty with respect to, customer safety at the Ramada Plaza and specifically regarding detection of and response to human trafficking at the hotel.

107. The Franchise Operations Venture violated the TVPRA through the widespread sex trafficking at the Ramada Plaza, including the trafficking of Plaintiff and other victims, and through the conduct of Franchisee Defendant, which violated the TVPRA as perpetrators by harboring, soliciting and/or patronizing sex trafficking victims as defined by 18 U.S.C. § 1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C. § 1591(a)(2).

108. Despite actual or constructive knowledge that the Franchise Operations Venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Franchisor Defendant participated in the venture by continuing to associate with Franchisee Defendant to operate the Ramada Plaza

in a way that the Franchisor Defendant knew or should have known would lead to further violations of 18 U.S.C. § 1591.

109. The Franchisor Defendant continued to provide the Franchisee Defendant with operational support, use of its trademarks, marketing services and other resources to operate the Ramada Plaza in a way that Franchisor Defendant knew or should have known was engaging in violations of 18 U.S.C. § 1591(a).

110. As described in greater detail below, the Franchisor Defendant was on notice of repeated incidences of sex trafficking occurring at the Ramada Plaza, and yet failed to take the necessary action to prevent sex trafficking in the following ways:

a. Failing to implement and enforce any of their own policies and protect Plaintiff from being sex trafficked;

b. Knowing or should have known that the respective hotels in which Plaintiff was sex trafficked were areas known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff was trafficked;

c. On information and belief, failing to require that employees participate in training to recognize, report and prevent sex trafficking; and

d. Despite having knowledge of the extensive prostitution and sex trafficking that occurred and occurs at the Ramada Plaza, they repeatedly failed to stop these actions.

111. The Franchisor Defendant exercised sufficient control over the Ramada Plaza, operated by the Franchisee Defendant, such that they could have prevented sex trafficking by:

a. Distributing information to assist employees in identifying sex trafficking;

b. Providing a process for escalating sex trafficking concerns within the organization;

c. Requiring employees to attend training related to sex trafficking;

d. Providing new hire orientation on human rights and corporate responsibility;

e. Providing training and education to their Ramada-branded franchise hotels, including the Ramada Plaza, through webinars, seminars, conferences and online portals;

f. Developing and holding ongoing training sessions on sex trafficking; or

g. Providing checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on sex trafficking prevention.

**Plaintiff Jane Roe was Sex Trafficked at Ramada Plaza by Wyndham**

112. From about late 2013 or early 2014 to about December 2016, Plaintiff was trafficked for sex at the Ramada Plaza by Wyndham located at 3 Watervliet Avenue Extension, Albany, NY 12206.

113. Nelson openly sex trafficked Plaintiff at the Ramada Plaza.

114. The General Manager of the Ramada Plaza ("G.M.") directly participated in the sex trafficking of Plaintiff and other women.

115. Nelson gave cash to the Ramada Plaza G.M. to facilitate and continue the sex trafficking venture at the hotel.

116. In addition, at the direction of Nelson, Plaintiff gave the Ramada Plaza G.M. approximately $150 per week to allow the sex trafficking venture to continue at the hotel.

117. Nelson used force and engaged in a scheme, plan and pattern to compel and induce Plaintiff to engage in and continue to engage in prostitution activity by means of instilling fear in Plaintiff through acts of violence and threats of acts of violence.

118. Plaintiff was subjected to physical violence, including beating her on a monthly basis until she collapsed.

119. Throughout her sex trafficking at the Ramada Plaza, Plaintiff made repeated attempts to escape from the sex trafficking venture.

120. On approximately eight separate occasions, Plaintiff left the Ramada Plaza, however, each time Nelson or his associates tracked her down and forcibly brought her back to the Ramada Plaza.

121. On each occasion, Plaintiff was physically assaulted by Nelson for leaving the Ramada Plaza, including on one occasion resulting in her assault by a baseball bat.

122. Nelson also used controlled access to drugs, deliberate addiction cultivation and/or drug debt bondage as a means to coerce Plaintiff and other women whom he trafficked at the Ramada Plaza to engage in commercial sex.

123. Nelson supplied Plaintiff with heroin, cocaine and crack cocaine so that she would continue to be sex trafficked.

124. Nelson publicly advertised "dates" (commercial sex) with Plaintiff and the other women he sex trafficked on such websites as backpage.com, craigslist.com, sugarnights.com and theeroticreview.com.

125. It was obvious—or at a minimum, should have been apparent—to hotel staff that Plaintiff and the other women were being trafficked.

126. There was heavy foot traffic in and out of the trafficker's rooms by men who were purchasers of sex trafficking and not hotel guests.

127. Dozens of men who were not hotel guests went in and out of the trafficker's rooms daily for the purpose of commercial sex.

128. The door leading to the rooms where Plaintiff and other women were sex trafficked was near the hotel front desk.

129. These men entered and left at unusual hours and were present at the hotel for brief periods (from 15 minutes to 1 hour), which are signs of sex trafficking that hotel staff observed.

130. These men did not carry bags or luggage with them into the hotel.

131. Housekeeping staff of the Ramada Plaza and hotel guests saw these men come in and out of the rooms.

132. Nelson paid extra money in cash to a Ramada Plaza maid to receive extra sheets and towels for the room where Plaintiff and other women were sex trafficked.

133. From about late 2013 or early 2014 to about July 2015, Nelson rented one room at the Ramada Plaza.

134. The room was paid for in cash, often by Plaintiff Roe, from cash given to her by Nelson.

135. Plaintiff accepted cash payments from the men with whom she was forced to engage in sexual acts.

136. There was heavy foot traffic in and out of Plaintiff's room involving men who were not hotel guests, approximately 4 to 8 men per evening.

137. Neither Plaintiff nor Nelson slept overnight at the hotel.

138. Instead, they would return the following day where they would rent another room for the purpose of sex trafficking.

139. From July 2015 to about December 2016, Nelson rented two rooms at the Ramada Plaza, paying in cash, for the duration of the sex trafficking of Plaintiff.

140. Plaintiff's sex traffickers paid for and held two rooms at the Ramada Plaza, one where the sex trafficking occurred and another primarily where Plaintiff and the other victims of sex trafficking slept.

141. Other women were being trafficked at the same hotel at the same time as Plaintiff and she shared a room with other female victims of sex trafficking.

142. There were month-long occasions when Nelson paid for and held a third room where he sex trafficked approximately five women.

143. Nelson instructed Plaintiff and the other women he trafficked how to greet men.

144. Each time a man arrived, they parked by the hotel pool.

145. Plaintiff or one of the other women being trafficked had to greet the men at a hotel entrance at the bottom of a staircase.

146. At various times, Nelson was trafficking several women at the Ramada Plaza in addition to Plaintiff.

147. Nelson required each woman to have approximately 7 "dates" per day.

148. This meant that on an average day during Plaintiff's stay at the Ramada Plaza, at least 30 men were greeted by and led to a room by the same women in open view of hotel staff and patrons.

149. Nelson was asked by the Ramada Plaza G.M. to switch floors multiple times, but the G.M. allowed the sex trafficking operation to continue.

150. The Ramada Plaza G.M. patronized the sex trafficking operation.

151. Nelson told Plaintiff that the Ramada Plaza G.M. was a "special person" and required Plaintiff to have paid sex with him about once per month for approximately one year.

152. Hotel employees delivered the sex trafficking operation enough sheets, towels and washcloths to allow at least 30 changes of bed sheets and towels per day.

153. Nelson also paid or directed others to pay cash to hotel employees in exchange for entire rolls of garbage bags, which allowed the sex trafficking operation to dispose of used condoms and drug paraphernalia approximately 15 times a day.

154. Nelson picked up large quantities of groceries and delivered food, enough to feed several people, in hotel entrances, lobbies and common areas on a daily basis, bringing the food to the rooms in which Plaintiff and other women were being held.

155. On many mornings, Nelson gathered large quantities of food, enough to feed several people, from the Ramada Plaza's buffet breakfast and took the food upstairs instead of eating it in the dining area.

156. On some mornings, Nelson directed Plaintiff to gather large quantities of food, enough to feed several people, from the Ramada Plaza's buffet breakfast and take the food upstairs instead of eating it in the dining area.

157. Hotel staff also observed signs that Plaintiff and other women being trafficked were using drugs.

158. Staff at the Ramada Plaza also permitted Nelson to hide drugs in publicly accessible areas in the hotel that he gave to women he trafficked, including Plaintiff.

159. Nelson hid heroin and intravenous needles in the foam insulation around the pipes in the stairwells, usually the stairwell nearest the pool.

160. On multiple occasions, Nelson directed Plaintiff and other women being trafficked to circulate around common areas of the Ramada Plaza at particular times to collect the drugs for their use.

161. Nelson also limited his victims' communications with hotel staff. For example, he rarely permitted his victims to be present during the check-in and check-out process. He also supervised the women when they left their hotel rooms for meals or interacted with hotel staff.

162. The Ramada Plaza G.M. also patronized the sex trafficking operation about once per month for over a year.

163. At night, Nelson would send one of the sex trafficking victims to have sex with the G.M.

164. Plaintiff's sex trafficking ended at the Ramada Plaza when she was able to escape successfully in about December 2016.

165. Wyndham Defendants had actual or constructive knowledge of sex trafficking occurring at the Ramada Plaza.

166. Defendant Super Host Hotels, Inc., as the franchisee of the Ramada Plaza, knew or should have known of the sex trafficking occurring at the Ramada Plaza based on (1) its General Manager's active facilitation and participation in the sex trafficking operation; (2) the obvious red flags of sex trafficking listed above; and (3) other sources of information available to them.

167. Defendant Wyndham Hotels & Resorts, Inc. knew or should have known of the sex trafficking occurring at the Ramada Plaza based on:

a. The obligation of hotel staff and Defendant Super Host Hotels, Inc. to report suspected criminal activity, including sex trafficking, to Wyndham Hotels & Resorts, Inc.;

b. Wyndham Hotels & Resorts, Inc.'s monitoring of online reviews, which mentioned the prevalence of sex trafficking at the Ramada Plaza;[10]

c. Wyndham Hotels & Resorts, Inc.'s monitoring of customer surveys and complaints;

d. Wyndham Hotels & Resorts, Inc.'s requirement that Defendant Super Host Hotels, Inc. submit regular and detailed reports to it about day-to-day hotel operations;

e. Wyndham Hotels & Resorts, Inc.'s collection and monitoring of data about guests at the Ramada Plaza, including, but not limited to, room reservations, identification and payment information, data from websites visited on Wi-Fi and other guest data;

f. Wyndham Hotels & Resorts, Inc.'s supervision and control over day-to-day operations of the Ramada Plaza through information and reports that it obtained through the property management system and other software systems it required Defendant Super Host Hotels, Inc. to use and through which they were obligated to allow Wyndham Hotels & Resorts, Inc. to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g. Wyndham Hotels & Resorts, Inc.'s regular inspections of the Ramada Plaza;

h. Wyndham Hotels & Resorts, Inc.'s access to surveillance and security systems;

[10] For example, in June 2016, a review on Kayak.com mentioned "obvious prostitutes" going "in and out," and an October 2015 review on TripAdvisor.com noted that there were "definitely prostitutes by the outside door"—likely referring to the entrance where Plaintiff and other women were forced to greet buyers.

i. Information provided to Wyndham Hotels & Resorts, Inc. by law enforcement; and/or

j. Other sources of information available to Wyndham Hotels & Resorts, Inc.

168. Because policies purportedly enacted and enforced by Wyndham Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Ramada Plaza, Plaintiff's sex traffickers were able to continue the trafficking venture at the Ramada Plaza.

169. If Wyndham Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their Ramada-branded hotels after observing the obvious signs of trafficking described above, then Plaintiff's trafficking would have been identified and reported, which would have prevented her trafficking at the Ramada Plaza.

170. If Wyndham Defendants followed the franchise policies enacted by Defendant Wyndham Hotels & Resorts, Inc. to identify and prevent trafficking from occurring at Ramada-branded hotels as described above, then Plaintiff's sex trafficking would have been identified and reported, which would have prevented her trafficking at the Ramada Plaza.

171. Despite obvious signs of sex trafficking and indicators of commercial sex activity, Wyndham Defendants failed to recognize, stop or report the venture occurring on the premises that resulted in Plaintiff's trafficking and consequently, actively facilitated the trafficking venture.

172. Wyndham Defendants harbored or otherwise facilitated sex trafficking at their hotel properties and accordingly benefited, financially and otherwise, from the sex trafficking that Plaintiff suffered.

173. Furthermore, the Wyndham Defendants failed to prevent her continued victimization.

174. The Wyndham Defendants, acting by and through their agents, managers, vice-principals and employees, did not act to reduce or eliminate the sex trafficking in the Ramada Plaza, despite the obvious signs of sex trafficking and commercial sex taking place, because the Wyndham Defendants were actively engaged in the facilitation of and benefiting from said activities.

175. The Franchisor Defendant was in an agency relationship with Defendant Super Host Hotels, Inc. with respect to the Ramada Plaza, which offered public lodging services in the hotel.

176. This agency relationship was created through the Franchisor Defendant's exercise of an ongoing and systemic right of control over the day-to-day operations of Ramada-branded hotels, including the Ramada Plaza.

177. On information and belief, Defendant Wyndham Hotels & Resorts, Inc. exercised this control through various means, enforced through franchise agreements and related contracts, including, but not limited to:

a. Hosting online bookings on Defendant Wyndham Hotels & Resorts, Inc.'s domain;

b. Requiring Ramada-branded hotels to use Defendant Wyndham Hotels & Resorts, Inc.'s customer rewards program;

c. Requiring Ramada-branded hotels to use Defendant Wyndham Hotels & Resorts, Inc.'s property management system;

d. Requiring Ramada-branded hotels to keep audit reports and other records;

e. Controlling channels for guests to report complaints or provide

feedback regarding Ramada-branded hotels;

f. Generating reports and analysis of guest complaints and online reviews for Ramada-branded hotels;

g. Conducting regular inspections, quality assurance evaluation reports and audits for compliance with franchise agreement terms and Defendant Wyndham Hotels & Resorts, Inc.'s corporate policies;

h. Gathering reports of data generated by Ramada-branded hotels, including reservation, payment and occupancy information through Defendant Wyndham Hotels & Resorts, Inc.'s centralized systems;

i. Requiring Ramada-branded hotels to regularly report data regarding customer feedback to Defendant Wyndham Hotels & Resorts, Inc.;

j. Providing marketing requirements and standardized marketing services for Ramada-branded hotels;

k. Regulating all the policies, procedures and standards of Ramada-branded hotels from the front desks to the bathrooms;

l. Requiring Ramada-branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access, security and filtering;

m. Requiring management of Ramada-branded hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis, covering all aspects of hotel operations;

n. Setting required staffing levels for Ramada-branded hotels;

o. Requiring Ramada-branded hotels to make modifications to the properties upon Defendant Wyndham Hotels & Resorts, Inc.'s request and to refrain

from making substantial changes to the property without Defendant Wyndham Hotels & Resorts, Inc.'s permission;

p. Requiring Ramada-branded hotels to comply with Defendant Wyndham Hotels & Resorts, Inc.'s Human Rights Policy and other laws;

q. Regulating the rates for room rentals; and

r. Imposing insurance coverage requirements.

178. Because policies purportedly enacted and enforced by the Wyndham Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Ramada Plaza, Plaintiff's sex traffickers were able to continue the trafficking venture at the Ramada Plaza.

179. If the Wyndham Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their Ramada-branded hotels after observing an obvious sign of trafficking as described above, then Plaintiff's trafficking would have been identified and reported, which would have prevented her trafficking at the Ramada Plaza.

180. Due to the control that Defendant Wyndham Hotels & Resorts, Inc. assumed in educating, implementing and directing its branded hotels, including Ramada-branded hotels and the Ramada Plaza, the Wyndham Defendants failed to prevent trafficking in the following ways:

a. Not adequately distributing information to assist employees in identifying sex trafficking;

b. Failing to provide a process for escalating sex trafficking concerns within the organization;

c. Failing to mandate managers, employees or owners to attend training related to sex trafficking;

d. Failing to provide new hire orientation on human rights and corporate responsibility;

e. Failing to provide training and education on sex trafficking through webinars, seminars, conferences and online portals;

f. Failing to develop and hold or require ongoing training sessions on sex trafficking;

g. Failing to provide checklists, escalation protocols and information to property management staff; and

h. Failing to track performance indicators and key metrics on sex trafficking prevention.

181. The Wyndham Defendants knew or should have known that sex trafficking was occurring on their properties, including the Ramada property where Plaintiff was sex trafficked, but the Wyndham Defendants failed to take any steps to prevent and/or stop the sex trafficking of Plaintiff.

182. If the hotel staff were properly trained, then the sex trafficking red flags would have been recognized and reported.

183. But the Wyndham Defendants chose not to invest the time and resources to implement and execute any anti-sex trafficking programs and/or protocols.

184. On information and belief, the Wyndham Defendants demonstrated willful blindness to the rampant sex trafficking that occurs at their Ramada-branded properties throughout the country.

185. This same willful blindness to sex trafficking facilitated the trafficking of Plaintiff.

## CAUSES OF ACTION

### AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION:
***(Perpetrator Liability Under the TVPRA, 18 U.S.C. § 1595(a); Defendant Super Host Hotels, Inc.)***

186. Plaintiff repeats and realleges each and every previous allegation contained in this Complaint and incorporates them here.

187. At all relevant times, Plaintiff was and is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a).

188. Nelson is a perpetrator of sex trafficking within the meaning of 18 U.S.C. § 1595(a) because, in the ways described above, he:

a. Violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing and soliciting Plaintiff and other women, knowing or in reckless disregard of the fact that they would be caused, through means of force, threats of force, fraud, coercion or any combination thereof, to engage in commercial sex acts; and

b. Violated 18 U.S.C. § 1591(a)(2) by knowingly receiving financial and other benefits, including cash payments from buyers, by knowingly assisting, supporting and facilitating a venture engaged in violations of 18 U.S.C. § 1591(a)(1), knowing that Plaintiff and other women would be caused, through such means, to engage in commercial sex acts.

189. The Franchisee Defendant is liable as a perpetrator of sex trafficking within the meaning of 18 U.S.C. § 1595(a) because, in the ways described above, it:

a. Violated 18 U.S.C. § 1591(a)(1) by harboring Plaintiff, knowing or in reckless disregard of the fact that she would be caused, through means of force, threats of force, fraud and coercion, to engage in commercial sex acts at the Ramada Plaza; and

b. Violated 18 U.S.C. § 1591(a)(2) by knowingly receiving financial and other benefits by knowingly assisting, supporting and facilitating a venture engaged in violations of 18 U.S.C. § 1591(a)(1), knowing that Plaintiff would be caused, through such means, to engage in commercial sex acts at the Ramada Plaza.

190. Additionally, the Franchisee Defendant, through the actions of its general manager of the Ramada Plaza, is liable as a perpetrator of sex trafficking within the meaning of 18 U.S.C. § 1595(a) because, in the ways described above, the general manager violated 18 U.S.C. § 1591(a)(1) by soliciting, patronizing and enticing Plaintiff and other women, knowing or in reckless disregard of the fact that they were being caused, through means of force, threats of force, fraud and coercion, to engage in commercial sex acts at the Ramada Plaza.

191. The TVPRA violations, acts and omissions of the Franchisee Defendant were a direct, producing and proximate cause of the injuries and damages to Plaintiff.

192. By reason of the foregoing, the Franchisee Defendant is liable for the damages set forth above.

193. Because the violations complained of herein constitute a single continuing pattern of unlawful conduct extending into the limitations period, this claim is timely.

**AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION:**
***(Beneficiary Liability Under the TVPRA, 18 U.S.C. § 1595(a);***
***All Defendants*)**

194. Plaintiff repeats and realleges each and every previous allegation contained in this Complaint and incorporates them here.

195. At all relevant times, Plaintiff was and is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a).

196. The Wyndham Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as described above, the Wyndham Defendants knowingly benefitted, by receiving financial or other things of value, from their participation in a venture they knew or should have known was engaged in sex trafficking, in violation of the TVPRA.

197. Through acts and omissions more fully described above, the Wyndham Defendants received a benefit from participating in a Room-Rental Venture with sex traffickers at the Ramada Plaza, including Plaintiff's trafficker, Nelson.

198. The Wyndham Defendants violated the TVPRA through their participation, as a beneficiary, in the Room-Rental Venture as follows:

a. The Room-Rental Venture resulted when the Wyndham Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at their respective hotel(s) by renting them hotel rooms and providing them related services despite the fact that the Wyndham Defendants knew or should have known these traffickers were using the hotel(s) to engage in violations of 18 U.S.C. §§ 1591(a)(1) and (a)(2), including the trafficking of Plaintiff.

b. This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including Plaintiff, in the rooms of the Ramada Plaza.

c. For the reasons described in greater detail above, the Wyndham Defendants knew or should have known that the Room-Rental Venture engaged in

violations of the TVPRA.

d. The venturers shared a common purpose: the generation of revenue and profits through this continuous business relationship. The Wyndham Defendants profited or otherwise benefited while Plaintiff's trafficker was able to rent a secure venue to earn profits by trafficking women, including Plaintiff. Traffickers (including Plaintiff's trafficker) rented rooms to earn profits by exploiting trafficking victims (including Plaintiff).

e. The Wyndham Defendants received a financial benefit every time a trafficker rented a room, including, among other things, management fees, franchise royalty fees, reservation fees, marketing fees, access to data collection, loyalty program fees and/or other ancillary fees from the operation of the hotels, which are primarily based on gross room rentals.

f. The Wyndham Defendants participated in the venture by continually renting rooms to Plaintiff's trafficker, failing to properly implement anti-trafficking rules and policies and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all while ignoring the obvious signs of Plaintiff's trafficking alleged above.

g. The Wyndham Defendants knowingly benefited from their participation in the Room-Rental Venture.

199. Through acts and omissions more fully described above, the Wyndham Defendants received a financial benefit from participating in a Franchise Operations Venture in owning, operating and/or licensing the Ramada Plaza.

200. The Wyndham Defendants violated the TVPRA through participation, as a beneficiary, in this commercial venture as follows:

a. The Franchise Operations Venture is a commercial venture that resulted from the continuous business relationships to own, supervise, operate, license, franchise and/or manage hotels, including between Defendant Wyndham Hotels & Resorts, Inc. and Defendant Super Host Hotels, Inc. to license, supervise, own, manage, operate and/or franchise the Ramada Plaza.

b. The venture shared a common objective of maximizing revenue at the Ramada Plaza, including gross room revenue. The Wyndham Defendants engaged in revenue sharing and had a common incentive to maximize revenue through the rental of hotel rooms.

c. The venture violated the TVPRA through the widespread sex trafficking that occurred at the Ramada Plaza, including the trafficking of Plaintiff.

d. This venture also violated the TVPRA through Franchisee Defendant's violations of 18 U.S.C. § 1591(a) as perpetrators of sex trafficking.

e. As described above, the Wyndham Defendants knew or should have known that the Franchise Operations Venture was engaged in violations of the TVPRA.

f. The Franchisor Defendant knowingly benefitted from this venture by generating revenue directly from the operation of the Ramada Plaza, including revenue generated specifically by renting rooms to traffickers. The Franchisor Defendant received, among other things, management fees, royalty fees, reservation fees, franchise fees, marketing fees, access to data collection, loyalty program fees, other ancillary fees and/or rental fees from the operation of the Ramada Plaza, which

increased every time a room was rented to a trafficker.

g. The Franchisor Defendant participated in the Franchise Operations Venture by (1) continuing the ongoing business relationship despite actual or constructive knowledge that the Ramada Plaza was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the Ramada Plaza; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the Ramada Plaza after they knew or should have known the venture was engaged in violations of the TVPRA.

h. The Franchisee Defendant also participated in the Franchise Operations Venture by actively facilitating trafficking at the Ramada Plaza as described above.

201. If the Wyndham Defendants did not continue participating in a commercial business venture that they knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), they would not have received a benefit from Plaintiff's trafficking.

202. The ventures in which Defendants participated were a direct, producing and proximate cause of the injuries and damages to Plaintiff.

203. The willful and malicious acts and/or omissions of Defendants caused injuries to Plaintiff.

204. Because the violations complained of herein constitute a single continuing pattern of unlawful conduct extending into the limitations period, this claim is timely.

**AS AND FOR PLAINTIFF'S THIRD CAUSE OF ACTION:**
***(Vicarious Liability for TVPRA Violations, 18 U.S.C. § 1595(a); Defendant Wyndham Hotels & Resorts, Inc.)***

205. Plaintiff repeats and realleges each and every previous allegation contained in this Complaint and incorporates them here.

206. Under the TVPRA and common law, an entity is vicariously liable for the acts and omissions of its agents and subagents.

207. The Franchisor Defendant is vicariously liable for the TVPRA violations of the Franchisee Defendant and the staff of the Ramada Plaza based on the existence of an actual agency relationship.

208. Defendant Wyndham Hotels & Resorts, Inc. is vicariously liable for the above-alleged TVPRA perpetrator and beneficiary violations of Defendant Super Host Hotels, Inc.

209. As a result of the relationship between the Franchisor Defendant and the Franchisee Defendant, the Franchisor Defendant is vicariously liable for the acts of the Franchisee Defendant that it controlled.

210. The Franchisor Defendant exercised control over the day-to-day operations of the Ramada Plaza as described above.

211. The Franchisor Defendant had the right to terminate its relationship with the Franchisee Defendant if it failed to comply with the Franchisor Defendant's requirements.

212. Thus, the Franchisor Defendant retained control, or the right to control, the mode and manner of the Franchisee Defendant's work.

213. The Franchisor Defendant is vicariously liable for the acts and omissions of the staff of Franchisee Defendant because the Franchisor Defendant acted as the joint employer of its employees, jointly controlling the terms and conditions of their employment.

214. The TVPRA violations, acts and omissions of Defendants were a direct, producing and proximate cause of the injuries and damages to Plaintiff.

215. By reason of the foregoing, the Franchisor Defendant is liable for the damages set forth above.

216. Because the violations complained of herein constitute a single continuing pattern of unlawful conduct extending into the limitations period, this claim is timely.

**AS AND FOR PLAINTIFF'S FOURTH CAUSE OF ACTION:**
***(Sex Trafficking Under the New York TVPJA; All Defendants)***

217. Plaintiff repeats and realleges each and every previous allegation contained in this Complaint and incorporates them here.

218. At all relevant times, Plaintiff was and is a victim of the conduct prohibited by New York State Penal Law § 230.34(1), because she was patronized for prostitution and her sex traffickers intentionally advanced or profited from her prostitution by unlawfully providing to her, with intent to impair her judgment, a narcotic drug or a narcotic.

219. At all relevant times, Plaintiff was and is a victim of the conduct prohibited by New York State Penal Law § 230.34(5), because she was patronized for prostitution and her sex traffickers intentionally advanced or profited from her prostitution by using force or engaging in a scheme, plan or pattern to compel or induce Plaintiff to engage in or continue to engage in prostitution activity by means of instilling a fear in Plaintiff that, if the demand were not complied with, the traffickers or others would: cause physical injury, serious physical injury or death to a person; cause damage to property, other than the property of the actor; engage in other conduct constituting a felony or Unlawful Imprisonment in the Second Degree in violation of Penal Law § 135.05; or perform an act that would not in itself materially benefit the actor but which was calculated to harm Plaintiff materially with respect to her health or

safety.

220. Defendants are liable for advancing sex trafficking under New York State Social Services Law § 483-bb(c)(i) because they knowingly advanced, or should have known that they were advancing, an act or acts in violation of New York State Penal Law §§ 230.34(1) and (5).

221. The Wyndham Defendants knowingly advanced or should have known that they were advancing actions undertaken by sex traffickers, including Nelson, that violated New York State Penal Law §§ 230.34(1) and (5).

222. The Wyndham Defendants advanced these actions by:

a. Renting rooms to Nelson, Plaintiff's sex trafficker, and providing them related services;

b. Failing to properly implement anti-trafficking rules and policies; and

c. Assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance.

223. For the reasons described in greater detail above, the Wyndham Defendants actually knew or should have known that this conduct advanced actions that violated New York State Penal Law §§ 230.34(1) and (5).

224. The Franchisee Defendant knowingly advanced or should have known that it was advancing actions undertaken by sex traffickers, including Nelson, that violated New York State Penal Law §§ 230.34(1) and (5).

225. The Franchisee Defendant advanced these actions by:

a. Renting rooms to Nelson and Plaintiff's sex traffickers and harboring the sex trafficking operation that trafficked Plaintiff;

b. Operating the hotel and hotel rooms where Nelson and Plaintiff's sex traffickers harbored and trafficked Plaintiff;

c. Coordinating with Plaintiff's sex traffickers to allow and protect their sex trafficking operation by providing them custom housekeeping services, multiple rooms in close proximity and other concessions or protections described in greater detail above;

d. Failing to properly implement anti-trafficking rules and policies;

e. Failing to train and supervise their agents and employees and correct their inattention to the plights of their patrons; and

f. Assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance.

g. Further, Defendant Super Host Hotels, Inc. allowed Nelson and Plaintiff's sex traffickers to hide narcotic drugs in hotel common areas that were used to induce Plaintiff to engage or continue engaging in prostitution and, through the actions of the Ramada Plaza G.M., solicited and patronized women trafficked alongside Plaintiff for commercial sex.

226. For the reasons described in greater detail above, including the obvious red flags of trafficking present at the Ramada Plaza and the active participation in the trafficking of certain employees of Franchisee Defendant, the Franchisor Defendant actually knew or should have known that this conduct advanced actions that violated New York State Penal Law §§ 230.34(1) and (5).

227. The Franchisor Defendant knowingly advanced or should have known that it was advancing actions undertaken by Plaintiff's sex traffickers, including Nelson, that violated New York State Penal Law §§ 230.34(1) and (5).

228. The Franchisor Defendant advanced these actions by:

a. Continuing an ongoing business relationship with the Franchisee Defendant to license, franchise, supervise, control, support and/or operate the Ramada Plaza;

b. Directly involving themselves in and supporting aspects of hotel operations that it knew or should have known were facilitating trafficking at the Ramada Plaza;

c. Operating jointly with the Franchisee Defendant to rent rooms to Plaintiff's sex trafficker, including by providing online reservation platforms and other support;

d. Failing to train and supervise their agents and employees and correct their inattention to the plights of their patrons;

e. Continuing to lend the perceived legitimacy of their brand and provide marketing services for Ramada Plaza; and

f. Failing to prevent trafficking despite their joint control over customer safety at the Ramada Plaza, specifically regarding detection of and response to human trafficking.

229. For the reasons described in greater detail above, including the obvious red flags of trafficking present at the Ramada Plaza, the Franchisor Defendant actually knew or should have known that this conduct advanced actions that violated New York State Penal Law §§

230.34(1) and (5).

230. Nelson knowingly advanced actions undertaken by himself and others that violated New York State Penal Law §§ 230.34(1) and (5).

231. Nelson advanced these actions by:

a. Harboring Plaintiff and others at the Ramada Plaza and forcing them to engage in commercial sex;

b. Unlawfully providing to Plaintiff, and/or directing others to unlawfully provide to her, heroin and cocaine and crack cocaine; and

c. Compelling or inducing Plaintiff to engage in or continue engaging in prostitution by beating and/or directing others to beat Plaintiff, threatening and/or directing others to threaten Plaintiff and/or directing others to threaten to withhold drugs on which Plaintiff had become dependent.

232. Defendants are liable for profiting from Plaintiff's sex trafficking under New York State Social Services Law § 483-bb(c)(i) because they knowingly profited from, or should have known that they were profiting from, an act or acts that violated New York State Penal Law §§ 230.34(1) and (5).

233. The Franchisee Defendant knowingly profited from or should have known that it was profiting from an act or acts in violation of New York State Penal Law §§ 230.34(1) and (5) in the form of room rental fees, in-room purchases, managing fees, marketing fees, other ancillary expenses by patrons and visitors of the hotels and/or access to data collection, each of which increased every time a room was rented to a trafficker.

234. The Franchisor Defendant knowingly profited from or should have known that it was profiting from an act or acts in violation of New York State Penal Law §§ 230.34(1) and

(5) in the form of management fees, franchise fees, room rental fees, royalty fees, reservation fees, loyalty program fees, access to data collection, marketing fees and/or other ancillary fees from the operation of the hotels, each of which increased every time a room was rented to a sex trafficker.

235. For the reasons described in greater detail above, including the obvious red flags of trafficking present at the Ramada Plaza, the Wyndham Defendants actually knew or should have known that these benefits derived from violations of New York State Penal Law §§ 230.34(1) and (5).

236. Nelson knowingly profited from violations of New York State Penal Law §§ 230.34(1) and (5) by accepting cash payments from buyers in exchange for commercial sex with Plaintiff and other women whom he intentionally trafficked and harbored at the Ramada Plaza.

237. The acts and/or omissions of Defendants were willful and malicious.

238. The willful and malicious acts and/or omissions of Defendants caused injuries to Plaintiff.

**AS AND FOR PLAINTIFF'S FIFTH CAUSE OF ACTION:**
***(Vicarious Liability for the New York TVPJA Violations;***
***Defendant Wyndham Hotels & Resorts, Inc.)***

239. Plaintiff repeats and realleges each and every previous allegation contained in this Complaint and incorporates them here.

240. Under the New York State TVPJA and state common law, an entity is vicariously liable for the acts and omissions of its agents and subagents.

241. The Franchisor Defendant is vicariously liable for the above-described New York State TVPJA violations of its Franchisee Defendant and of the staff of the Ramada Plaza based on the existence of an actual agency relationship.

242. Defendant Wyndham Hotels & Resorts, Inc. is vicariously liable for the above-alleged New York State TVPJA violations of Defendant Super Host Hotels, Inc.

243. As a result of the relationship between the Franchisor Defendant and the Franchisee Defendant, the Franchisor Defendant is vicariously liable for the acts of the Franchisee Defendant which it controlled.

244. The Franchisor Defendant exercised control over the day-to-day operations of the Ramada Plaza as described above.

245. The Franchisor Defendant had the right to terminate its relationship with the Franchisee Defendant and the Ramada Plaza if it failed to comply with the Franchisor Defendant's requirements.

246. Thus, the Franchisor Defendant retained control, or the right to control, the mode and manner of Franchisee Defendant's work.

247. The Franchisor Defendant is vicariously liable for the acts and omissions of the staff of Franchisee Defendant because the Franchisor Defendant acted as the joint employer of these employees, jointly controlling the terms and conditions of their employment.

248. The New York State TVPJA violations, acts and omissions of Defendants were a direct, producing and proximate cause of the injuries and damages to Plaintiff.

249. By reason of the foregoing, the Franchisor Defendant is liable for the damages set forth above.

250. The acts and omissions of Defendants were a direct, producing and proximate cause of the injuries and damages to Plaintiff.

251. By reason of the foregoing, the Franchisor Defendant is liable for the damages set forth above.

## **DEMAND FOR JURY TRIAL**

Plaintiff herein demands a trial by jury for all issues in this action.

## **REQUESTED RELIEF**

**WHEREFORE**, Plaintiff respectfully prays for a Judgment against Defendants as follows:

i. Awarding Plaintiff compensatory damages for mental, emotional, psychological and physical injuries, distress, pain and suffering and for injury in an amount to be determined at trial;

ii. Awarding Plaintiff punitive damages to be determined at trial;

iii. Awarding Plaintiff reasonable attorney fees, litigation expenses and costs incurred in bringing this action;

iv. Awarding Plaintiff pre-judgment and post-judgment interest available under law; and

v. Such other relief as this Court deems appropriate and just under the circumstances.

Dated: August 17, 2026
New York, New York

Respectfully submitted,

Andrew M. Stengel

*Attorneys for Plaintiff*
The Law Firm of Andrew M. Stengel, P.C.
11 Broadway, Suite 715
New York, NY 10004
Tel: (212) 634-9222
Fax: (212) 634-9223
E-mail: andrew@stengellaw.com